UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 22-cr-261 (JRT/DJF) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Darius Mark Tucker, | |
| Defendant. | |

This matter is before the Court on Defendant Darius Mark Tucker's Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Motion to Suppress Evidence") (ECF No. 24) and Motion to Suppress Statements, Admissions, and Answers ("Motion to Suppress Statements") (ECF No. 25). Mr. Tucker argues that the June 28, 2022 search and seizure of his person violated his Fourth Amendment rights such that the Court should suppress any and all evidence obtained as a result (ECF No. 24). Mr. Tucker further argues that the Court should suppress a statement he made to police while in custody immediately after his arrest. (*See* ECF No. 25.)

Because the police officers involved had sufficient reasonable suspicion to stop and question Mr. Tucker, and because Mr. Tucker's conduct during the attempted investigatory stop provided officers independent probable cause to arrest him, the Court recommends denying Mr. Tucker's Motion to Suppress Evidence. The Court further recommends denying Mr. Tucker's Motion to Suppress Statements because he made the statement underlying his motion voluntarily.

1

I.   **Background**

Minneapolis Police Department Officer Joseph Foxley testified at the hearing on Mr. Tucker's motions. On June 28, 2022, Officer Foxley was working in South Minneapolis with the focused enforcement detail ("FED") of the Minneapolis Police Department. The goal of the FED is to "combat the ongoing violent crime in the city through proactive police work, such as stopping individuals, placing them in custody, that are armed with firearms or that have narcotics on their person[s]." (Tr. 12–13.) Officer Foxley and his partner, Sergeant Misgen, were in a marked squad car in full uniform. (*Id.* at 12; Ex. 2 at 0:59.) They were working with five or six other officers, some of whom were in plain clothes and driving unmarked vehicles. (Tr. 12.) The FED was also working with confidential informants ("CIs"), who provided intelligence for officers to target and stop armed individuals. (*Id.* at 12–13.)

On the evening of June 28, an officer who was working with the FED received a tip from a CI that a black male wearing a purple T-shirt and shorts was carrying a gun and standing by a black Cadillac near a homeless encampment on 14th Avenue South on the 2800 block, between 28th Street East and 29th Street East. (*Id.* at 15–16.) Another officer in plain clothes and an unmarked car drove through the area and observed an unidentified black male in a purple T-shirt at the location the CI had identified. (*Id.* at 16.) He added to the CI's description by noting that the black Cadillac was on the east side of the street facing northbound, and that the individual was standing by the driver's side door outside the Cadillac. (*Id.*) Upon receiving this information, Officer Foxley and Sergeant Misgen communicated to other FED officers working in the area that they planned to initiate a stop, and confirmed the other officers were available to assist. (*Id.*)

Approximately ten minutes after the tip from the CI came in (Tr. 42), Officer Foxley and Sergeant Misgen stopped their vehicle behind the black Cadillac. Mr. Tucker was wearing shorts

2

and a purple T-shirt and was standing next to the open driver's side door. (Ex. 1 at 0:49.) Both officers opened their doors, drew their weapons, and pointed them at Mr. Tucker. (*Id.*; Ex. 2 at 0:51.) Sergeant Misgen yelled at Mr. Tucker to put his hands on his head three times in a span of roughly five seconds. (Ex. 1 at 0:49–0:54.) At the same time Officer Foxley twice instructed Mr. Tucker to put his hands up, then ordered him to put his hands behind his back. (Ex. 2 at 0:49–52.) Mr. Tucker responded by placing his hands in the air and asking, "Why, why?," to which Officer Foxley replied, "Because you got a gun." (*Id.* at 0:51–54.) Roughly seven seconds into the stop, Mr. Tucker turned his back to the officers, lowered his hands and sat down in the vehicle. (*Id.* at 0:56–0:57.) As Mr. Tucker sat down in the vehicle, Sergeant Misgen yelled, "Hey!" and began to run toward Mr. Tucker. (*Id.* at 0:57–0:58.)

Sergeant Misgen then grabbed Mr. Tucker and attempted to force him to exit the vehicle. (*Id.* at 1:00–1:04.) Sergeant Misgen and Mr. Tucker struggled for roughly five seconds before Officer Foxley joined them. (*Id.* at 1:00–1:05.) The car's engine could be heard revving in the background. (*Id.* at 1:06.) Officer Foxley then yelled "I see the gun, I see the gun!" (*Id.* at 1:07–1:09.) Officer Foxley gained control of the weapon and placed it beside the vehicle on the street. (*Id.* at 1:09–1:13.) The officers continued to struggle with Mr. Tucker in the driver's seat for roughly thirteen more seconds before a third officer approached and shot Mr. Tucker with a taser, at which point Sergeant Misgen was able to pull Mr. Tucker out of the vehicle and onto the street. (*Id.* at 1:24–1:27.)

Mr. Tucker continued to struggle with the officers while on the ground, refusing to put his hands behind his back and repeatedly asking, "Where's the gun?" (*Id.* at 1:35.) One of the officers responded, "It's on the ground[,]" to which Mr. Tucker replied, "Who got a gun?" (*Id.* at 1:35–1:41.) At that point an officer advised Mr. Tucker, "You're under arrest…." The struggle ended

roughly 90 seconds after the officers initiated the attempted stop when they were able to place Mr. Tucker in handcuffs. (*Id.* at 1:46–2:23.) Officer Foxley then searched Mr. Tucker and the car and seized a second weapon, magazines with ammunition, and suspected narcotics. (Tr. 27–30.)

While he was still on the ground and in handcuffs, and prior to any *Miranda* warning, Mr. Tucker asked the officers, "Hey, how do you guys know I can't have a carry?" (Ex. 2 at 3:18–3:21.) An officer responded, "We stopped to investigate that." (*Id.* at 3:21–3:24.) Mr. Tucker replied, "God damnit, y'all got me. Y'all got me fair and square." (*Id.* at 3:25–3:33.)

Law enforcement took Mr. Tucker to the hospital following his arrest because he exhibited overdose symptoms, and a baggie of suspected narcotics was found near his groin. (Tr. 32–33.) The police did not discover Mr. Tucker's identity until sometime after his arrest. (Tr. 35–36.)

The Government subsequently indicted Mr. Tucker on two counts of being a felon in possession of a firearm. (ECF No. 5.) The motions presently before the Court followed.

## II.     Analysis

### A.     Motion to Suppress Evidence

Mr. Tucker argues the police did not have probable cause to arrest him without a warrant based on a tip from a confidential informant that merely alleged a black male on a particular block was carrying a gun. (ECF No. 39 at 7.) The Government asserts the officers did not seize Mr. Tucker for Fourth Amendment purposes until after he began to flee, and that his flight provided independent probable cause for his arrest, regardless of whether the officers had legal grounds to stop him initially. (*See* ECF No. 41 at 7.)[1] In response, Mr. Tucker argues he did not flee, but

---

[1] The government also contests Mr. Tucker's challenge to the sufficiency of the tip on grounds that he did not offer evidence of racial bias at the suppression hearing, and further accuses defense counsel of attempting to "hide the factual issues in his motion." (ECF No. 41 at 6.) This argument mischaracterizes both Mr. Tucker's motion and the burden of proof, and the Court finds

4

instead merely "duck[ed] for cover in the face of multiple guns pointed at him." (ECF No. 42 at 9.)

The Court concludes the officers had legal authority to conduct an investigatory stop, based on the CI's tip that an unidentified individual had a gun and the plainclothes officer's partial corroboration of that tip. Moreover, the Court finds the officers' belief that Mr. Tucker attempted to flee was reasonable, such that his apparent flight provided an independent basis for probable cause to arrest him.

### 1. Investigatory Stop

"A warrantless search is presumptively unreasonable absent some exception to the warrant requirement." *United States v. Ringland*, 966 F.3d 731, 735 (8th Cir. 2020) (quotation omitted). One exception is that "[p]olice officers may briefly detain a person if they have a reasonable articulable suspicion that criminal activity is afoot; a mere hunch will not suffice." *United States v. Pope*, 910 F.3d 413, 414 (8th Cir. 2018) (citing *United States v. Cotter*, 701 F.3d 544, 547 (8th Cir. 2012)). Such investigatory stops are often called *Terry* stops, after the namesake case *Terry v. Ohio*, 392 U.S. 1 (1968). Courts consider the "'the totality of the circumstances' when determining whether reasonable suspicion supported an officer's stop." *Pope*, 910 F.3d at 414 (quoting *Cotter*, 701 F.3d at 547). A limited protective search for weapons during a *Terry* stop is permissible if the subject might be armed. The purpose of this limited search is "to allow the officer to pursue his investigation without fear of violence, … thus the frisk for weapons might be equally necessary and reasonable[.]" *Adams v. Williams*, 407 U.S. 143, 146 (1972).

---

defense counsel did nothing improper in raising a general challenge to the warrantless search of his person and property.

Mr. Tucker points out that carrying a firearm is legal in Minnesota if the individual carrying it has a permit to do so.  (ECF No. 39 at 8, asserting that it "is generally not a crime to possess a firearm in Minnesota".)  He argues that because the police did not know his identity when they attempted to stop him, they had no basis to reasonably believe his possession of a firearm was illegal.  (*Id*. at 8-9.)

This argument misconstrues the Minnesota law against carrying a gun without a permit. *See* Minn. Stat. 624.714.  Here—in contrast with states in which carrying a gun is presumptively legal, and lack of a permit is an element of the crime itself—it is presumptively *illegal* to carry a gun, and the possession of a permit merely provides an affirmative defense for which the defendant bears the burden of proof.  *State v. Timberlake*, 744 N.W.2d 390, 394–96 (Minn. 2008) (holding that the permit requirement is an affirmative defense to a carrying without a permit charge under Minn. Stat. § 624.714); *State v. Williams*, 794 N.W.2d 867, 872–873 (Minn. 2011) (same).  In states where carrying a weapon is a criminal offense and possession of a permit is an affirmative defense, if the police have reasonable suspicion that an individual has a gun—even if they do not know whether the individual has a permit—they may conduct an investigatory stop. *Pope*, 910 F.3d at 415–417 (holding that in Iowa, where a weapons permit is an affirmative defense to a carrying charge, an officer only needs reasonable suspicion that the subject has a weapon to conduct an investigatory stop).  Under this clear Eighth Circuit precedent, so long as the officers had reasonable suspicion Mr. Tucker was carrying a gun, they had a legal basis to conduct an investigatory stop to determine his identity and assess whether he had a permit to carry it.[2]

---

[2] While the Court is sensitive to the policy concerns Mr. Tucker raises regarding the potential for racial profiling in this context (*see* ECF No. 42 at 4), it is not the province of this Court to enact policy, but rather, to apply the applicable statutes and binding precedent.

Whether the attempted stop was legal therefore turns on whether the tip from the CI was sufficiently reliable to establish reasonable suspicion that the individual who was later identified as Mr. Tucker had a gun. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) (holding that an uncorroborated anonymous tip was insufficient to establish reasonable suspicion for a *Terry* stop). As a threshold matter, this question depends on the status of the CI. "Four types of informants exist: 1) anonymous unproven informants, 2) anonymous proven informants, 3) known unproven informants, and 4) known proven informants." *United States v. Rosas*, 11-cr-188-RHK-SER, 2011 WL 7046028, at *8 (D. Minn. Nov. 23, 2011), *report and recommendation adopted in relevant part*, 2012 WL 124970 (D. Minn. Jan. 17, 2012). Known informants are more reliable than unknown informants because their reputations can be assessed and they can be held responsible for fabrications. *J.L.*, 529 U.S. at 270. A tip from a known proven informant does not necessarily need to be verified, as "an informant may establish the reliability of his information by establishing a track record of providing accurate information." *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995) (citing *Illinois v. Gates*, 462 U.S. 213, 233 (1983)). When an informant is known but unproven, there must be "some independent verification" to establish the reliability of the information. *Id.* (quoting *United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994)). "[C]orroboration of minor innocent details can suffice to establish [not just reasonable suspicion, but] probable cause." *United States v. Evans*, 4 F.4th 633, 637 (8th Cir. 2021) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)) (second bracket added).

In this case the police were working directly with the CI (Tr. 14-15), such that the CI was known. But there is no evidence in the record to suggest the CI had a reliable track record, so the CI is best characterized as an unproven, known informant. Some form of independent verification of the tip was thus required, but to establish the reliability of the CI's tip the police only needed to

7

corroborate minor details. *Evans*, 4 F.4th at 637. They obtained such corroboration when the plainclothes officer drove past the location the CI had identified and confirmed there was a black male in a purple T-shirt standing by a black Cadillac at that location (Tr. 15–16). The Court finds for these reasons that the officers had reasonable suspicion to conduct an investigatory stop.

### 2. Probable Cause

Mr. Tucker challenges whether his warrantless seizure and arrest were supported by probable cause. "The Supreme Court has interpreted the Constitution to permit reasonable seizures of persons [for] … a warrantless arrest based on the officer's determination of probable cause, such as a suspect who commits a crime in the officer's presence[.]" *Furlow v. Belmar*, 52 F.4th 393, 401 (8th Cir. 2022) (citing *District of Columbia v. Wesby*, 583 U.S. ----, 138 S. Ct. 577, 586 (2018)). To determine whether probable cause exists, courts "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 138 S. Ct. at 586 (quotations and citations omitted). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (quoting *Gates*, 462 U.S. at 232). "Probable cause is not a high bar." *Id.* (quotation omitted).

Here, the Government asserts Mr. Tucker's attempt to flee established independent probable cause for his seizure and arrest. Under Minnesota Statute § 609.487, subd. 3, "Whoever by means of a motor vehicle flees or attempts to flee a peace officer who is acting in the lawful discharge of an official duty, and the perpetrator knows or should reasonably know the same to be

a peace officer, is guilty of a felony[.]" Evading arrest or detention by means other than flight in a motor vehicle is prohibited under another subdivision of the same statute. *See* Minn. Stat. § 609.487, subd. 6. Under this law, if the officers reasonably believed Mr. Tucker was attempting to flee the scene before they seized him, that reasonable belief would establish probable cause. This would be true even if the Court had not found—as it has here—that the initial attempted investigatory stop was lawful, because a suspect's conduct in response to an unlawful stop or arrest may establish probable cause. *See, e.g.*, *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995); *United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015); *see also United States v. Somerville*, No. 20-CR-153-PAM-KMM, 2021 WL 3476596, at *13 (D. Minn. May 13, 2021) (Minnesota law does not recognize a right to flee from an unlawful stop or arrest) (citing *State v. Kutchara*, 350 N.W.2d 924, 927 (Minn. 1984)), *report and recommendation adopted*, 2021 WL 2886257 (D. Minn. July 9, 2021), *aff'd sub nom*, *United States v. Finley*, 56 F.4th 1159 (8th Cir. 2023).

The Government and Mr. Tucker agree, and the Court finds, that a seizure of Mr. Tucker's person occurred for Fourth Amendment purposes when Sergeant Misgen grabbed him and attempted to pull him from the car. (*See* ECF No. 41 at 6-7; ECF No. 42 at 10 n.4.) *See Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) ("We hold that that the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."); *California v. Hodari D.*, 499 U.S. 621, 628–29 (1991) (holding that a seizure occurs when: (1) there is a show of authority by officers the suspect complies with; or (2) officers use physical force upon the suspect). But Mr. Tucker disagrees with the Government's contention that his behavior preceding that seizure was evidence of an attempt to flee in response to the officers' commands. Mr. Tucker argues instead that he made a "split-second" decision to duck for cover,

in an instinctual reaction to the terrifying situation of having multiple guns pointed at him. (ECF No. 39 at 10–11.)

The problem with Mr. Tucker's argument is that the video evidence does not support it. The video reflects there was a roughly six- to seven-second period between the point when Officer Foxley and Sergeant Misgen stepped out of their vehicle and when Mr. Tucker began to sit down in his vehicle. (*See* Ex. 2 at 0:49–1:00.)  Mr. Tucker was initially facing the officers and communicating with them.  In response to their commands, he slowly turned his back on them with his hands still in the air, and then lowered his arms and sat down in the driver's seat of the car. (*Id.*)  His movements were not sudden and do not appear to have been a startled reflex. (*Id.*)

Moreover, regardless of whether Mr. Tucker was actually responding in fear or was instead attempting to flee, "[t]he existence of probable cause 'is determined from the standpoint of an objectively reasonable police officer' not the defendant." *United States v. Finley*, 56 F.4th 1159, 1165 (8th Cir. 2023) (quoting *Walz v. Randall*, 2 F.4th 1091, 1100 (8th Cir. 2021)).  The Court finds that an objectively reasonable police officer could have viewed Mr. Tucker's decision to ignore the officers' commands, turn his back on them and sit down in the driver's seat of his car as an attempt to evade arrest and flee.  Because Mr. Tucker's seizure and arrest occurred after his behavior suggested he was attempting to flee, the Court finds his arrest was supported by probable cause and recommends denying his Motion to Suppress Evidence.

### B.  Motion to Suppress Statements

Mr. Tucker's Motion to Suppress Statements challenges the admissibility of a single statement uttered after the officers had handcuffed him, when he said, "God damnit, y'all got me. Y'all got me fair and square." (Ex. 2 at at 3:25–3:33.)  He argues this incriminating statement must be suppressed under the Fifth Amendment because it resulted from a custodial interrogation

without a proper *Miranda* warning. (ECF No. 39 at 14.) *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (establishing the black-letter rule that before questioning a custodial suspect, police must advise him of his rights against self-incrimination and his right to counsel).

In applying the *Miranda* rule, the Eighth Circuit has held that, "Interrogation is express questioning, or words or actions that the police should know are reasonably likely to elicit an incriminating response[.]" *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) (quotation omitted), *cert. denied*, 516 U.S. 1150 (1996). Though the *Miranda* rule applies to responses to interrogatory questions, it does not apply to a "voluntary statement made by a suspect, not in response to interrogation … with or without the giving of *Miranda* warnings." *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) (quotation omitted). "Coercive government activity is necessary to prove that a statement was not voluntary." *Hatten*, 68 F.3d at 262 (citations omitted).

*Hatten* is instructive in this case. In *Hatten*, officers drew their service weapons and stopped two individuals at a vehicle, where they later found a gun and marijuana. The defendant initially refused to comply and only did so after one of the officers threatened to "blow his head off." *Id.* at 259. Officers took the defendant into custody and left him in an interview room. *Id.* at 259–60. When one of the officers entered the room, and before anyone gave the defendant a *Miranda* warning, he: (1) asked whether it would affect the charges if he carried the gun for protection; (2) alleged the gun was for his protection because he had been shot at before; and (3) admitted the marijuana was his. *Id.* at 260. In moving to suppress these statements, the defendant argued they were not voluntary, but coerced, in light of the fact that the officer had threatened to blow his head off and then placed him in a small basement interview room. Noting that the defendant had made the statements without prompting and that any responses from the officer were

not interrogatory, the *Hatten* court found the statements were voluntary and denied the defendant's motion. *Id.* at 262.

Here there is no dispute that Mr. Tucker was in custody and had not received a *Miranda* warning when he made the statement in question, but his statement was unprompted and uncoerced. Mr. Tucker initiated the exchange leading to the statement by asking, "Hey, how do you guys know I can't have a carry?" (Ex. 2 at 3:18–3:21.) An officer responded by stating, "We stopped to investigate that." (*Id.* at 3:21–3:24.) Nothing about the officer's response solicited a reply; the officer merely answered Mr. Tucker's voluntary question. Upon hearing the officer's response, Mr. Tucker then volunteered the statement at issue, "God damnit, y'all got me. Y'all got me fair and square." (*Id.* at 3:25–3:33.) Because this statement clearly flows from an exchange voluntarily initiated by Mr. Tucker, and nothing about the officer's response to Mr. Tucker's initial question prompted or coerced any reply from Mr. Tucker, the Court finds the statement was voluntarily made. The Court accordingly recommends denying Mr. Tucker's Motion to Suppress Statements.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. [24]) be **DENIED**; and

2. Defendant's Motion to Suppress Statements, Admissions, and Answers (ECF No. [25]) be **DENIED**.

Dated: February 21, 2023

*s/ Dulce Foster*
Dulce J. Foster
United States Magistrate Judge

## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).